# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 28, 2010 Session

## STATE OF TENNESSEE v. JAMES WALTER GROOMS

**Appeal from the Criminal Court for Hamblen County**
**No. 08CR671     John F. Dugger, Jr., Judge**

---

**No. E2010-00347-CCA-R3-CD - Filed November 29, 2010**

---

The defendant, James Walter Grooms, appeals his Hamblen County Criminal Court jury conviction of telephone harassment, a Class A misdemeanor, for which he received a sentence of 11 months and 29 days' incarceration suspended after the service of 10 days in jail. He argues that the evidence is insufficient to support his conviction and that the trial court imposed an excessive sentence. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Ethel P. Rhodes, Assistant Public Defender, Morristown, Tennessee, for the appellant, James Walter Grooms.

Robert E. Cooper, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Kim Morrison, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The victim, Department of Children's Services (DCS) investigator Kelly Burke, visited the defendant's home on October 14, 2008. When no one answered the door, she left her business card with a message asking the defendant to call her about a report her agency had received. While on her way to another home visit, the defendant telephoned her on her work cellular telephone. She said that the defendant "was very irate on the phone, yelling and screaming" and blaming his brother for the report. The victim happened to be talking to her husband on her personal cellular telephone, via "bluetooth" or hands-free

capability, and her husband was able to hear someone "screaming" at her. After making arrangements to meet with the defendant within the next hour, the victim telephoned her supervisor and reported that the defendant had been "hostile" during their telephone conversation. Her supervisor recommended that she take law enforcement personnel with her for the visit.

The victim conducted the home visit with the assistance of Morristown Police Officers Dustin Jones and Pete Shockley. A drug screen performed on the defendant's niece who was at the house had revealed the presence of marijuana. The defendant was unable to produce a urine sample sufficient for his drug screen. At that point, the victim explained the "walk-through" procedures to the defendant and told him that his failure to produce a urine sample would result in a failed drug screen on her report.

The victim then conducted a walk-through where she found a bottle of Gabapentin prescribed to the defendant's mother in the defendant's son's bedroom. The defendant initially denied knowledge of the prescription but eventually admitted that he took the pills "for pain." When the victim explained to the defendant that he should not be taking someone else's medication, the defendant "started getting irate, starting yelling, started screaming, ['Y]ou get the F'ing out of my house.[']" The victim said that she was shocked by the defendant's behavior and asked him if his drugs were more important than his son, to which he replied, "I don't F'ing care. You put my child into State's custody."

When the victim and the officers left the defendant's home, the victim began efforts to locate the child's mother in order to make a "relative placement" of the defendant's son rather than send the child to state custody. She based the removal of the child from the home on the niece's positive drug screen and the discovery of the prescription bottle in the child's bedroom. At her office, she realized that she had "inadvertently picked up" the prescription bottle and decided to telephone the local pharmacy concerning the prescription. When she telephoned the pharmacy, the defendant's mother happened to be there and spoke to the victim about placing the boy in her custody.

At approximately 2:45 that afternoon, the defendant telephoned the victim. She recalled that the defendant was very upset about his son's removal. The victim testified that the defendant said, "[H]ow dare you, if I catch you out I'll kill you, how dare you." The victim told the defendant that she would not listen to him and hung up the telephone. As before, the victim was on her personal cellular telephone with her husband who overheard the exchange between the victim and the defendant. At 3:01 p.m., the defendant telephoned the victim a third time and said, "Well, I changed my mind. I want my child back. If I catch you out, I will hurt you. I want my child back." The victim hung up the telephone again.

The victim testified that she was scared and feared that the defendant would "carry out the threat." She said that no one had ever threatened to kill her before. In an effort to avoid any further contact with the defendant, DCS transferred the case to another case worker, Shane Ratliff. The victim filed a complaint against the defendant the following morning. She recalled that the defendant was present when the boy was transferred to the defendant's mother's custody but that the defendant stayed outside when the victim was present.

Houston Burke, the victim's husband and a deputy with the Claiborne County Sheriff's Department, recalled talking on the telephone with his wife on October 14, 2008, when she received a call on her work telephone. He heard a man "yelling and screaming" and acting "very irate." The same man telephoned his wife later that afternoon, and he overheard the man say, "I will kill you, if I catch you out I will hurt you, I will kill you." Mr. Burke said that his wife was scared and that he was concerned for her safety.

Morristown Police Department Officer Dustin Jones assisted the victim with a "home check" at the defendant's home on October 14, 2008. He said that when the defendant was unable to produce a urine sample, the victim explained that his child would have to go into state custody, and the defendant "became agitated" and told them to leave. Officer Jones said that the defendant "wasn't happy with us being there."

The defendant testified that he telephoned the victim on October 14, 2008, after finding a contact card on his door. When the victim explained that she needed to do a home check, the defendant told her that he had a pending lawsuit against the Morristown Police Department, so he wanted to talk to his lawyer before agreeing to a home check. The defendant said that the victim told him that she would remove the child from school if he failed to cooperate with the home check, so he scheduled the visit for approximately an hour later. The victim arrived with Officers Jones and Shockley and informed the defendant that there had been a report that the defendant was manufacturing methamphetamine and selling cocaine from the residence. The victim also told the defendant that he "made her nervous" because he refused to allow her to search through dresser drawers. When the defendant told the victim that he would not allow such a search without a warrant, the victim told him that she could "do whatever [she] want[ed] to do." At this point, the defendant told the victim to "get the F out of my house" because she was "screaming and hollering" at him.

The defendant denied yelling at the victim. He also denied admitting to taking his mother's medication. When the defendant learned from a school nurse that his son had been removed from school, he telephoned the victim to find out how to get him back. He claimed that the victim said, "You're not getting him back." The defendant denied threatening the victim, other than admitting that he threatened to arrest her for kidnapping.

The defendant said that he spoke with police officers at his home that afternoon about having the victim arrested for kidnapping, but he acknowledged that there was no report taken by the police. He also claimed that he passed every drug screen given during the pendency of the custody dispute. Four months after his removal, the child was returned to the defendant's custody.

Helen Grooms, the defendant's mother, overheard the victim tell the defendant that he could not get the child back. She denied that her son threatened the victim in any way and said that he would not threaten harm but would instead "take[] it to court." James Walter Grooms, Sr., the defendant's father, said that the defendant did not threaten to kill the victim. The defendant's wife, Rhonda Grooms, testified that DCS and her child's school had her cellular telephone number and there was "no reason" why she would not have received a call from the victim, implying that the victim did not attempt to contact her.

The victim testified in rebuttal that the defendant tested positive for marijuana during the course of this investigation. She also recalled Helen Grooms's visiting her at her office, purportedly to review the defendant's drug screen, and threatening the victim by "making comments about [her] personal life" such as knowing where she shopped and lived, that she had three children, and that her husband was in law enforcement. During this meeting, Helen Grooms also apologized for her son's behavior and admitted to the victim that she had overheard him threatening to kill the victim.

Based upon this evidence, the jury convicted the defendant of telephone harassment. *See* T.C.A. § 39-17-308(1). The trial court imposed a sentence of 11 months and 29 days suspended after the service of 10 days in jail. On appeal, the defendant contends that the evidence is insufficient to support his conviction and that his sentence is excessive. The State asserts that the evidence is sufficient and that the defendant has waived consideration of the propriety of his sentence by failing to include a transcript of the sentencing hearing in the record on appeal. We agree with the State on both points.

We review the defendant's claim about evidence insufficiency mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 324 (1979); *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters,* 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at

655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant was indicted for "intentionally threatening by telephone to take action known to be unlawful against [the victim], and by this action, knowingly alarm[ing] [the victim]." *See* T.C.A. § 39-17-308(1). On appeal, the defendant argues that the State failed to prove that he:

1. Placed one or more telephone calls anonymously, or

2. At an inconvenient hour, or

3. In an offensively repetitious manner, or

4. Without a legitimate purpose of communication, and
by this action knowingly annoyed or alarmed the recipient.

This language, however, tracks a subsection of the telephone harassment statute other than the one of which the defendant was indicted and convicted. *See* § 39-17-308(2). In the light most favorable to the State, the evidence showed that the defendant telephoned the victim and threatened to hurt or kill her. The victim was scared and feared the defendant would carry out his threat. The evidence is sufficient to support his conviction of telephone harassment.

As to the defendant's allegation that the trial court imposed an excessive sentence, the State correctly points out that the defendant has waived this issue by failing to include a transcript of the sentencing hearing. "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard,* 855 S.W.2d 557, 560 (Tenn. 1993) (citing *State v. Bunch,* 646 S.W.2d 158, 160 (Tenn. 1983)). When the record "does not contain a transcript of the proceedings relevant to an issue presented for review . . . an appellate court is precluded from considering the issue." *Id.* at 560-61 (citing *State v. Roberts,* 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). Moreover, in the absence of a record to review, "the appellate court must conclusively presume that the ruling of the trial judge was correct." *State v. Draper,* 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990); *see also State v. Oody,* 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). In the absence of the sentencing hearing transcript, we must presume that the sentencing decision

of the trial court is correct.

The judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE